**KOLARI, Plaintiff,**

v.

**NEW YORK–PRESBYTERIAN HOSPITAL, et al.,
Defendants.**

**Barbour, Plaintiff,**

v.

**New York–Presbyterian Hospital, et al., Defendants.**

**Eroglu, Plaintiff,**

v.

**New York–Presbyterian Hospital, et al., Defendants.**

Nos. 04 Civ.5506LAP, 04 Civ.5733LAP, 04 Civ.7573LAP.

United States District Court, S.D. New York.

March 29, 2005.

Bernstein Liebhard & Lifshitz, LLP, Keith M. Fleischman, Ronald J. Aranoff, New York City, for Shkelqim Kolari.

Napoli & Bern, LLP, Denise A. Rubin, New York City, for Gloria Eroglu and George Barbour.

Sills Cummis Epstein & Gross P.C., James S. Frank, Jeffrey J. Greenbaum, James M. Hirschhorn, New York City, and Latham & Watkins LLP, James V. Kearny, Stuart S. Kurlander, New York City, for New York and Presbyterian Hospital and New York–Presbyterian Healthcare System.

Hogan & Hartson, L.L.P., Ty Cobb, Mitchell E. Zamoff, Catherine E. Stetson, Washington, DC, and Hogan & Hartson, L.L.P., Eric J. Stock, New York City, for The American Hospital Association.

## OPINION AND ORDER

PRESKA, District Judge.

### INTRODUCTION

Plaintiffs here have lost their way; they need to consult a map or a compass or a

Constitution because Plaintiffs have come to the judicial branch for relief that may only be granted by the legislative branch. This action is one of dozens of similar bootless actions filed in twenty-three district courts across the United States on behalf of uninsured and indigent patients, wherein Plaintiffs argue, without basis in law, that private non-profit hospitals are required to provide free or reduced-rate services to uninsured persons. More specifically, Plaintiffs claim that the rates charged by the defendant hospital to uninsured patients are unreasonable merely because various insurers have negotiated with the hospital to pay lower rates—an economically efficient outcome for both sides that is fully sanctioned by New York law.

To support these non-legal arguments, several pages of the Complaint under the heading of "The Lack of Health Insurance in New York" are devoted to statistics of the kind normally associated with legislative hearings. Plaintiffs note, for example, that:

> The lack of health insurance is a major problem for many New Yorkers. For example, in 2002, most uninsured New Yorkers (57% in New York City, and 59% in New York State) work full-time. Some uninsured New Yorkers (10% in New York City, and 13% in New York State) work part-time, while 33% in New York City and 29% in New York State were unemployed. Am. Compl. ¶ 17.[1] During 2001–2002, 45% of non-citizens, compared to 20% of citizens in New York City were uninsured; and 43% of non-citizens, compared to 14% of citizens were uninsured in New York State. Am. Compl. ¶ 18.
>
> During the period 2000–2002, New York State's uninsured rate was higher than that of the United States. For example, in 2002, New York State's uninsured rate was 18% (25% in New York City) versus 17% for the United States; and in 2000, New York State's uninsured rate was 18% (25% in New York City) versus 16% for the United States. Am. Compl. ¶ 20.
>
> Employer-based coverage is often unavailable or unaffordable. Uninsured people who have jobs may face one or more of the following barriers:
>
> a. Smaller employers are less likely to offer health insurance to their employees because premiums are prohibitively expensive;
>
> b. Service and labor jobs are less likely to provide workers with health insurance;
>
> c. Part-time workers are often not eligible for insurance;
>
> d. Even when employers offer health insurance to low-wage workers, the premiums tend to be higher than for higher-paid workers. Low-wage workers have a harder time affording these premiums, and are more likely to remain uninsured. Am. Compl. ¶ 22.
>
> Further, people who lose their jobs often lose health insurance. Am. Compl. ¶ 23.
>
> Buying coverage in the private individual market is often prohibitively expense. Am. Compl. ¶ 25.
>
> The health care safety net leaves many people uncovered, especially adults. Am. Compl. ¶ 26.
>
> Specifically, families in New York with incomes at, or below, 200 percent of the federal poverty level were much more likely to be uninsured than families with incomes above 200 percent of the federal poverty level. For example, in 2002,

---

1. "Am. Compl." refers to the Amended Complaint filed on September 20, 2004 by plaintiff Shkelqim Kolari and Sarah Vail [Docket No. 13] that serves as the lead complaint in this consolidated action.

85% (or 1.5 million) of the 1.8 million uninsured in New York City were "low-income" individuals with annual income no greater than 200% of the federal poverty level. In 2002, for individuals, 200% of the federal poverty level was $17,720. For New York State, 84% (or 2.5 million) of the 3.0 million uninsured were low-income individuals. Am. Compl. ¶ 27.

These are all "facts" and arguments that should be addressed to the political branches—perhaps, in this case, the New York Legislature—not the judicial branch. As set out below, the arguments Plaintiffs attempt to dress up as judicial branch arguments are all without merit. Indeed, at oral argument in this case, Plaintiffs' counsel conceded that two of Plaintiffs' claims should be dismissed. Plaintiffs around the country have fared no better.[2] This orchestrated assault on scores of non-profit hospitals, necessitating the expenditure of those hospitals' scarce resources to beat back meritless legal claims, is undoubtedly part of the litigation explosion that has been so well-documented in the media. E.g., WALTER K. OLSON, THE LITIGATION EXPLOSION: WHAT HAPPENED WHEN AMERICA UNLEASHED THE LAWSUIT (1991); PHILIP K. HOWARD, THE COLLAPSE OF THE COMMON GOOD: HOW AMERICA'S LAWSUIT CULTURE UNDERMINES OUR FREEDOM (2001). Here, Plaintiffs' ritualistic recourse to litigation will be rebuffed, leaving them to recalibrate their compass and seek relief, if they are so advised, from the political branches.

## PROCEDURAL HISTORY

The above-captioned actions were consolidated on November 8, 2004 upon joint motion of the parties [Docket No. 22]. The lead complaint in this case is the amended complaint filed on September 20, 2004, by plaintiff Shkelqim Kolari ("Kolari") against defendants New York–Presbyterian Hospital (the "Hospital"),[3] NY–

---

**2.** In October 2004, the Judicial Panel on Multidistrict Litigation rejected a motion to transfer and consolidate the actions pending around the country into one district. *In re Not–For–Profit Hospitals/Uninsured Patients Litig.,* 341 F.Supp.2d 1354 (Jud.Pan. Mult.Lit.2004). As of the date of this Opinion and Order, Plaintiffs had voluntarily dismissed thirty cases prior to a ruling on a motion to dismiss. In twenty-three additional actions, the district courts granted defendants' motions to dismiss. *See, e.g., Peterson v. Fairview Health Servs.,* No. Civ. A04–2973, 2005 WL 226168 (D.Minn. Feb. 1, 2005); *Shriner v. ProMedica Health System, Inc.,* No. 3:04 CV 7435, 2005 WL 139128 (N.D.Ohio Jan. 21, 2005); *Lorens v. Catholic Health Care Partners,* 356 F.Supp.2d 827 (N.D.Ohio 2005); *Ferguson v. Centura Health Corp.,* No. 04–M–1285, 2004 WL 3213447 (D.Colo. Dec. 29, 2004); *Burton v. William Beaumont Hosp.,* 347 F.Supp.2d 486 (E.D.Mich.2004); *Darr v. Sutter Health,* No. C 04–02624(WHA), 2004 WL 2873068 (N.D.Cal. Nov. 30, 2004); *Amato v. UPMC,* No. 04–1025 (W.D.Pa. Nov. 23, 2004); *Kizzire v. Baptist Health Sys., Inc.,* 343 F.Supp.2d 1074 (N.D.Ala.2004). In a Cook County, Illinois case, the court granted defendants' motion to dismiss with respect to two claims and denied the motion with respect to the Illinois state law claims. *Servedio v. Our Lady of the Resurrection Med. Ctr.,* No. 04 L 3381 (Cir.Ct.Ill. Jan. 6, 2005) (Nudelman, S.). No court has yet found for plaintiffs on any substantive legal issue.

**3.** The Amended Complaint identifies the hospital as "New York–Presbyterian Hospital" but in its Motion to Dismiss, defendant hospital identifies the proper name as "The New York and Presbyterian Hospital." The New York and Presbyterian Hospital operates on four campuses, including Columbia Presbyterian Medical Center, New York Weill Cornell Medical Center, the Allen Pavillion, and the Westchester Division. *See* Memorandum of Law of Defendants the New York and Presbyterian Hospital and New York–Presbyterian Health Care System, Inc. in Support of Their Motion to Dismiss the Amended Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim filed on October 12, 2004 [Docket No. 14] (hereinafter, "NY Def. Memo.") at n. 1.

Presbyterian Health Care System, Inc. (together, the "NYP Defendants"), and the American Hospital Association (the "AHA") (the "Amended Complaint") [Docket No. 13]. Plaintiffs George Barbour ("Barbour") and Gloria Eroglu ("Eroglu") filed amended complaints to reconcile their claims with those in the Amended Complaint on October 27, 2004 (respectively, the "Barbour Amended Complaint" and the "Eroglu Amended Complaint").

The NYP Defendants moved to dismiss counts 1–12 and 15 of the Amended Complaint on October 12, 2004, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure [Docket No. 14]. Defendant AHA moved to dismiss counts 13 and 14 of the Amended Complaint on November 9, 2004 [Docket No. 19]. To streamline the motion practice that was underway prior to the AHA's being added as a defendant and prior to consolidation, the Consolidation Order directed plaintiffs Barbour and Eroglu to file amended complaints adding the new counts that were added by Kolari in his amended complaint. In addition, because the AHA had filed its motion to dismiss the Kolari amended complaint, the AHA was instructed to file motions to dismiss the amended complaints in the Barbour and Eroglu actions on or before December 2, 2004. Plaintiffs in all three actions were instructed to respond to the AHA's motions to dismiss by December 24, 2004, and the AHA was instructed to submit one reply brief to the Plaintiff's several briefs in opposition to the motions. Accordingly, the AHA filed its motion to dismiss the Barbour and Eroglu complaints on December 12, 2004 [Docket No. 27]. I have reviewed and considered the Plaintiffs' various amended complaints and all of the moving papers and briefs filed by all of the plaintiffs and all of the defendants. In addition, I have considered the Notice of Supplemental Authority filed by Kolari on January 19, 2005 [Docket No. 39]. Oral argument was held on all motions to dismiss on January 12, 2005. For the following reasons, the motions to dismiss are granted in their entirety.

### BACKGROUND [4]

#### A. *Shkelqim Kolari and Sarah Vail*

On or about October 30, 2000, plaintiff Shkelqim Kolari ("Kolari") was severely burned on his arm. Am. Compl. ¶ 63. Although he did not have any health insurance, Kolari was taken by ambulance to New York Weill Cornell Medical Center, one of several hospitals comprising Defendant New York and Presbyterian Hospital. He was admitted on an inpatient basis and thereafter transferred to the Hospital's Burn Center, where Kolari spent eleven nights. Am. Compl. ¶¶ 63–65. After Kolari's discharge on November 10, 2000, he received a bill from the hospital for approximately $58,000. Am. Compl. ¶ 65. Kolari required outpatient care from the Burn Center every two weeks after his discharge. Am. Compl. ¶ 66. At each visit, the NYP Defendants required Kolari to pay $75 and sign a form concerning payment prior to receiving care. Am. Compl. ¶ 66. On many occasions, Kolari was unable to pay the $75 fee, and the doctors refused to treat him. Am. Compl. ¶ 67. As a result, Kolari received treatment for his burns monthly, instead of bi-monthly. Am. Compl. ¶ 67.

In November 2002, Sarah Vail ("Vail") was admitted to the New York Weill Cornell Medical Center due to complications stemming from her pregnancy. Am.

---

**4.** For purposes of the instant motions, the facts are viewed in the light most favorable to the nonmoving party. *See Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555, 562 (2d Cir.1985) (citing *Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Compl. ¶ 69. At the time of her admission, Vail did not have health insurance. Am. Compl. ¶ 69. She was admitted for approximately two nights, for which she was billed approximately $20,000. Am. Compl. ¶ 70.

Both Kolari and Vail have received numerous telephone calls and/or letters demanding payment of their respective hospital bills and threatening litigation. Am. Compl. ¶¶ 68, 71. Plaintiffs do not know the identity of the individual and/or entities who made the telephone calls attempting to collect on the NYP Defendants' bills. Am. Compl. ¶¶ 14, 68, 71; Tr. 29:18–30:3.[5] Instead, Plaintiffs allege that Network Recovery Services, Inc. is a not-for-profit corporation acting at the Hospital's urging. Am. Compl. ¶ 14.

## B. *George Barbour*

On a date not set forth in his amended complaint, plaintiff George Barbour ("Barbour"), a resident of New York, New York, sought and received medical treatment at New York Presbyterian Hospital/New York Weill/Cornell Medical Center.[6] Barbour Am. Compl. ¶¶ 46, 47.[7] Barbour was allegedly "charged fees far in excess of those charges that would have been applied to a bill presented to a private insurance carrier or governmental medical reimbursement program such as Medicare." Barbour Am. Compl. ¶ 47. Barbour was unable to pay his hospital bill, which led to the NYP Defendants' "repeated attempts to collect such pay-

ment, including filing a lawsuit" against Barbour. Barbour Am. Compl. ¶ 48. The lawsuit, captioned *Columbia Presbyterian Hospital v. George Barbour*, was filed in the Civil Court of the City of New York, New York County on June 9, 2004 under index number 031169/04. *See* Barbour Am. Compl. ¶ 48.

## C. *Gloria Eroglu*

On a date not set forth in her amended complaint, plaintiff Gloria Eroglu ("Eroglu"), a resident of New York, New York, sought and received medical treatment at New York Presbyterian Hospital/New York Weill/Cornell Medical Center.[8] Eroglu Am. Compl. ¶¶ 46, 47.[9] Eroglu was allegedly "charged fees far in excess of those charges that would have been applied to a bill presented to a private insurance carrier or governmental medical reimbursement program such as Medicare." Eroglu Am. Compl. ¶ 47. Eroglu was unable to pay her hospital bill, which led to the NYP Defendants' "repeated attempts to collect such payment, including harassing letters and telephone calls" to Eroglu. Eroglu Am. Compl. ¶ 48. Eventually, defendant New York–Presbyterian Hospital filed a lawsuit captioned *Columbia Presbyterian Hospital v. Gloria Eroglu* in the Civil Court of the City of New York, New York County,[10] under index number 65298/03. *See* Eroglu Am. Compl. ¶ 48.

---

5. "Tr." refers to the transcript of oral argument held on January 12, 2005.

6. The proper name of the hospital where Barbour received treatment is identified in footnote 1 above.

7. "Barbour Am. Compl." refers to the Amended Complaint filed by George Barbour on October 27, 2004, which appears as docket number 11 in 04 Civ. 5733.

8. The proper name of the hospital where Eroglu received treatment is identified in footnote 1 above.

9. "Eroglu Am. Compl." refers to the Amended Complaint filed by Gloria Eroglu on October 27, 2004, which appears as docket number 5 in 04 Civ. 7573.

10. The Amended Complaint erroneously identifies the site of this action as Kings County. The action was brought in New York County.

## DISCUSSION

### A. The Standard for Dismissal Under Rule 12(b)(1) and Rule 12(b)(6)

■ A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). "[T]he plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Luckett v. Bure,* 290 F.3d 493, 497 (2d Cir.2002) (citing *Makarova,* 201 F.3d at 113). District courts lack subject matter jurisdiction in cases brought to enforce the Internal Revenue Code where such cases have not been authorized by the Secretary of the Treasury and the Attorney General. *See* 26 U.S.C. § 7401 (1976) ("No civil action for the collection or recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General or his delegate directs that the action be commenced."). In considering challenges to subject matter jurisdiction under Rule 12(b)(1), a court may consider evidence extrinsic to the pleadings, such as affidavits. *See Antares Aircraft, L.P. v. Fed. Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991), *vacated for reconsideration on other grounds,* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992), *reaff'd on remand,* 999 F.2d 33 (2d Cir.1993).

In deciding a motion to dismiss under Rule 12(b)(6), I must view the complaint in the light most favorable to the plaintiff. *Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555, 562 (2d Cir.1985) (citing *Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). I must accept as true the factual allegations stated in the complaint, *Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), and draw all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Hertz Corp. v. City of N.Y.,* 1 F.3d 121, 125 (2d Cir.1993). A motion to dismiss can only be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### B. Application

#### Federal Law Claims

#### 1. Claims Arising From 26 U.S.C. § 501(c)(3)

Plaintiffs bring a breach of contract claim as purported third party beneficiaries to the "express and/or implied contract[ ]" between the NYP Defendants, as charitable entities, and the United States Government pursuant to 26 U.S.C. § 501(c)(3). Compl. ¶ 88. Section 501(c)(3) provides, in pertinent part, that organizations formed and operated exclusively for charitable purposes shall be exempt from taxation. *See* 26 U.S.C. § 501(c)(3). Plaintiffs argue that this provision has essentially created a contract between the United States Government and the NYP Defendants. Am. Compl. ¶ 88, 89. Plaintiffs claim to be third party beneficiaries to this contract. Am. Compl. ¶ 91.

■ As a threshold matter, a plaintiff lacks standing to enforce rights allegedly created by another person's tax exemption, either in suits against the federal government or against the exempt entity. *See, e.g., Selman v. Harvard Med. Sch.,* 494 F.Supp. 603, 616–17 (S.D.N.Y.1980) (finding student at foreign medical school attacking § 501(c)(3) status of domestic medical school lacked standing). To the extent that Plaintiffs seek to enforce any real or imagined rights created by § 501(c)(3), Plaintiffs lack standing to do so.

■ In addition, the clear language of 26 U.S.C. § 7401 precludes me from enforcing any section of the Internal Revenue Code without the authorization of the Secretary of the Treasury and the United States Attorney General. 26 U.S.C. § 7401. As Plaintiffs have not satisfied their burden of establishing subject matter jurisdiction, *see Luckett v. Bure,* 290 F.3d 493, 497 (2d Cir.2002) (citing *Makarova,* 201 F.3d at 113), to the extent that Plaintiffs seek to enforce the Internal Revenue Code, such claims are dismissed pursuant to Federal Rule of Civil Procedure Rule 12(b)(1).

■ Plaintiffs attempt to circumvent the issues of standing and subject matter jurisdiction by claiming to be third party beneficiaries of the contract that allegedly arose out of the NYP Defendants' tax exempt status. Such an argument is untenable because the IRS does not grant tax exempt status by contract. Instead, it makes determinations or administrative rulings as to whether entities comply with § 501(c)(3) and are therefore exempt. *See* 26 C.F.R. §§ 1.501(c)(3)–1(b)(6), (c)(3)(iv), (e). The Internal Revenue Code allows an entity seeking exempt status, and only that entity, to obtain judicial review of the IRS determination. *See* 26 U.S.C. § 7428(b). An IRS determination no more creates a contract than does any other judicial or administrative determination. Without language in § 501(c)(3) to indicate that Congress intended to create a contract, the presumption is that statutes are not, and do not create, contracts. *See Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 465–66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985). An examination of § 501(c)(3) indicates it does not contain any such language.

■ Even if Plaintiffs were third party beneficiaries of a contract between the NYP Defendants and the United States Government, a third party beneficiary has no more rights under the contract than the party who has allegedly contracted on that person's behalf. *See United Steelworkers of Am., AFL–CIO–CLC v. Rawson,* 495 U.S. 362, 375, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990); *Benson v. Brower's Moving & Storage, Inc.,* 907 F.2d 310, 313 (2d Cir. 1990), *cert. denied,* 498 U.S. 982, 111 S.Ct. 511, 112 L.Ed.2d 524 (1990). The only right of the United States, which conferred the tax exemption, is to assess and collect the taxes due if an entity fails to comply with the terms of the exemption. *See* 26 U.S.C. §§ 4958, 6201, 6212–13; *United States ex rel. United States—Namibia (Southwest Africa) Trade and Cultural Council, Inc. v. Africa Fund,* 588 F.Supp. 1350, 1351 (S.D.N.Y.1984) ("If the [Defendant] improperly obtained tax exempt status, the government's [only] recourse would be to revoke such status through administrative action and then to proceed to make a tax liability assessment and to issue a Notice of Deficiency for taxes due."). Even as third party beneficiaries, Plaintiffs would be unable to obtain the relief they are seeking.

In a final attempt to substantiate their argument that § 501(c)(3) creates a contract, Plaintiffs analogize § 501(c)(3) to the Hill–Burton Act, 42 U.S.C. § 291, a government program that awarded funds to hospitals servicing uninsured or indigent patients. Plaintiffs argue that because courts recognized the Hill–Burton Act as an enforceable contract between hospitals and the Government, § 501(c)(3) should also be read as forming a contract. Pl. Memo. at 6;[11] *see Flagstaff Med. Ctr., Inc.*

---

**11.** "Pl. Memo." refers to Plaintiffs' Memorandum in Opposition to the Motion by The New–York Presbyterian Hospital and New York Presbyterian Health Care System, Inc. to Dismiss the Amended Complaint filed on November 3, 2004.

*v. Sullivan,* 962 F.2d 879 (9th Cir.1992). However, neither in their many moving papers nor at oral argument were Plaintiffs able to articulate a single legal basis for this analogy. In fact, as Judge Oliver in *Lorens v. Catholic Health Care Partners,* 356 F.Supp.2d 827, 832 (N.D.Ohio 2005), recently noted, the Hill–Burton Act is substantially different from 26 U.S.C. § 501(c)(3) for the following reasons:

> The Hill–Burton Act provided direct funds to hospitals; § 501(c)(3) provides tax exemptions. The Hill–Burton Act required applicants to sign a "Memorandum of Agreement" containing express contractual language; § 501(c)(3) recognition is accorded by the IRS with no such contractual agreement. *See Euresti v. Stenner,* 458 F.2d 1115 (10th Cir. 1972). The Hill–Burton Act provided funds for organizations performing specific, pre-negotiated purposes; § 501(c)(3) provides tax exemptions to organizations for multiple permissible purposes. The Hill–Burton Act provided for a private cause of action to enforce the Act, *see* 42 U.S.C. § 300s–6; § 501(c)(3) only permits the IRS or the organization seeking tax exemption to challenge a determination on § 501(c)(3) eligibility. *See* 26 U.S.C. § 7428(a).

*Id.* at 832. For all of these reasons, Plaintiffs' analogy to the Hill–Burton Act fails.

It is clear that the NYP Defendants' § 501(c)(3) tax-exempt status does not create a contract between the United States of America and the NYP Defendants. Accordingly, Plaintiffs cannot be third party beneficiaries thereof. This claim is dismissed for lack of standing, lack of subject matter jurisdiction, and failure to state a claim upon which relief can be granted.

### 2. Implied Right of Action Under Section 501(c)(3)

Plaintiffs allege that they have an implied right of action for the NYP Defen-dants' failure to operate for charitable purposes pursuant to § 501(c)(3). For the same reasons set out above in dismissing Plaintiffs' claim for breach of contract, this count is dismissed.

### 3. Violation of the Fair Debt Collection Practices Act

■ Plaintiffs assert that the NYP Defendants and the John Doe defendants are debt collectors, as defined by 15 U.S.C. § 1692, and that they violated the Fair Debt Collection Practices Act ("FDCPA") by engaging in "aggressive, abusive, and humiliating collection practices." *See* Am. Compl. ¶¶ 122–124. The Amended Complaint also states that outside collection agencies, including First Consulting Group and Network Recovery Services, acted as agents for the NYP Defendants in collecting outstanding bills from uninsured patients. Am. Compl. ¶ 123.

The FDCPA defines a "debt collector," in part, as:

> [A]ny person ... in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.... [T]he term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts.

> The term does not include—

> · · · · ·

> (B) any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business

of such person is not the collection of debts;

. . . . .

15 U.S.C. § 1692a(6).

■ A plain reading of the statute makes clear that, as a matter of law, the NYP Defendants are not debt collectors subject to the FDCPA. *See Maguire v. Citicorp Retail Services, Inc.,* 147 F.3d 232, 235 (2d Cir.1998). In addition, a creditor that is not itself a debt collector is not vicariously liable for the actions of a debt collector it has engaged to collect its debts. *Wadlington v. Credit Acceptance Corp.,* 76 F.3d 103, 107 (6th Cir.1996). Plaintiffs have not named as parties the collection agencies it identifies in the Amended Complaint. On the face of the Amended Complaint, Plaintiffs fail to state a claim under the FDCPA upon which relief can be granted.

At oral argument, Plaintiffs attempted to argue that the NYP Defendants' relationship with National Recovery Service brings the NYP Defendants within the false name exception of the FDCPA. Under this exception, "a creditor may be deemed a debt collector under the false name exception if, 'in the process of collecting his own debts, [the creditor] uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts,' 15 U.S.C. § 1692a(6), if it 'pretends to be someone else' or uses 'a pseudonym or alias,' *Maguire,* 147 F.3d at 235 (quoting *Villarreal v. Snow,* No. 95–2484, 1996 WL 473386, at *3 (N.D.Ill. Aug. 19, 1996)), or if it owns and controls the debt collector, rendering it the creditor's alter ego." *Mazzei v. Money Store,* 349 F.Supp.2d 651, 659 (S.D.N.Y.2004) (citing *Maguire,* 147 F.3d at 234–35).

Plaintiffs have not proffered a single fact in support of their allegation, first introduced at oral argument, that the NYP Defendants fall within the false name ex-

ception. Accordingly, Plaintiffs' FDCPA claim is dismissed with prejudice.

**4. Violation of the Emergency Medical Treatment and Active Labor Act**

■ The Amended Complaint asserts that the NYP Defendants conditioned emergency hospital treatment on Plaintiffs' ability to pay in violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"). The EMTALA provides that a hospital participating in Medicare must provide a medical screening examination to any individual who comes into its emergency room for an emergency medical condition to determine whether such emergency medical condition exists. 42 U.S.C. § 1395dd. An emergency medical condition is defined, in relevant part, as:

"a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iv) serious dysfunction of any bodily organ or part."

42 U.S.C. § 1395dd(e)(1).

If such a condition exists, the hospital is required to provide sufficient medical treatment to stabilize the condition. 42 U.S.C. § 1395(dd)(b).

In order to state a claim under the EMTALA, a plaintiff must allege that he went to the emergency room of a participating hospital seeking treatment for a medical condition, and that the hospital did not adequately screen him to determine whether he had an emergency medical condition, or discharged or

transferred him before such a condition had been stabilized.

*Fisher by Fisher v. New York Health and Hosps. Corp.*, 989 F.Supp. 444, 448 (E.D.N.Y.1998).

Plaintiffs' EMTALA claim fails because, in addition to not alleging a refusal of services or screening, Plaintiffs do not allege that they suffered "personal harm as a direct result of a participating hospital's violation of a requirement section." *See* 42 U.S.C. § 1395dd(2)(A). Participating hospitals are permitted to use "reasonable registration processes" which include asking whether an individual is insured, as long as registration does not delay screening or treatment. 42 C.F.R. § 489.24(d)(4). Plaintiffs have not alleged any such delay. The Amended Complaint states:

> Prior to the NYP Defendants' admission of any patient, including uninsured patients, into their hospitals and/or emergency rooms for emergency medical care, the NYP Defendants require their patients to sign a form contract promising to pay, in full, for unspecified and undocumented charges for medical care that are pre-set by the NYP Defendants in their sole discretion.

Am. Compl. ¶ 44. However, Kolari's specific allegations indicate that he was not required to sign such a form contract prior to his ten-day admission at the Hospital; instead, he was required to sign a form contract prior to his follow-up visits in the Burn Center. *See* Am. Compl. ¶¶ 64–66; Tr. 55:1–55:3 ("But in the case of Mr. Kolari, he signed the form contract during his aftercare program. When he went for aftercare he signed the contract."). Plaintiff Vail does not allege that she was ever required to sign a contract or that her treatment was delayed as a result of the Hospital's registration process. Am. Compl. ¶¶ 69–73. Similarly, neither Barbour nor Eroglu allege that he or she was

ever required to sign such a contract or that his or her treatment was delayed as a result of the Hospital's registration process. *See* Barbour Am. Compl. ¶¶ 46–49; Eroglu Am. Compl. ¶¶ 46–49. Plaintiffs' conclusory allegations unsupported (and, in the case of Kolari, contradicted) by factual assertions "fail[ ] even the liberal standard of Rule 12(b)(6)." *See De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir.1996) (internal citations omitted).

Moreover, the EMTALA authorizes the recovery of damages for personal injury under the law of the state in which the hospital is located; the EMTALA does not authorize the injunctive or declaratory relief sought by Plaintiffs. *See* 42 U.S.C. § 1395dd(2)(A).

**5. Violation of 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the U.S. Constitution**

In a particularly stunning statement that demonstrates that Plaintiffs should be addressing the political branches, not the judiciary, Plaintiffs allege that the NYP Defendants have assumed the role of providing the "essential public and government function of health care for uninsured indigent patients" and that the NYP Defendants have overcharged such patients with the assistance of state procedures and laws. *See* Am. Compl. ¶¶ 156, 157. Plaintiffs further allege that the NYP Defendants' billing and collection practices have a disparate impact on racial minorities who are disproportionately represented among the uninsured population amounting to invidious discrimination. Am. Compl. ¶ 158. Accordingly, Plaintiffs assert that the NYP Defendants have engaged in invidious discrimination against uninsured patients.

 "To state a claim for relief in an action brought under § 1983, [Plaintiffs] must establish that they were deprived of a right secured by the Constitu-

tion or laws of the United States and that the alleged deprivation was committed under color of state law." *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). Because, as Plaintiffs' counsel well knows (having conceded at oral argument that this count should be dismissed, Tr. 45:6–8), there is no constitutional right to free health care and because the NYP Defendants are not state actors, *see Purgess v. Sharrock,* 806 F.Supp. 1102, 1111 (S.D.N.Y.1992) (not-for-profit hospital not state actor in discharge of physician), this count is dismissed.

### 6. Breach of Charitable Trust

 The Amended Complaint alleges that by accepting federal tax exemptions, "the NYP Defendants created and entered into a public charitable trust to provide mutually affordable medical care to its uninsured patients." Am. Compl. ¶ 117. However, charitable trusts are express trusts that arise and exist only pursuant to an expression by the settlor to create a trust. *See Orentreich v. Prudential Ins. Co. of Am.,* 275 A.D.2d 685, 713 N.Y.S.2d 330, 332 (1st Dep't 2000) (stating that the essential elements of a trust include a designated beneficiary, a designated trustee, a clearly identifiable *res,* and delivery of *res* by the settlor with the intent of vesting legal title in the trustee). Defendants have failed to demonstrate the existence of these basic requirements for the creation of a charitable trust. Accordingly, this count is dismissed.

### State Law Claims

 The supplemental jurisdiction conferred by 28 U.S.C. § 1367(a) permits me to adjudicate the state law claims raised by Plaintiffs because those claims are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a) (1990). Where, as here, the state claims are "so closely tied to questions of federal policy," the argument for exercise of supplemental jurisdiction "is particularly strong." *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 727, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

At oral argument, Plaintiffs acknowledged that "the heart and soul of [their] case is the fact that the hospitals are charging rates, discriminatory rates, that are much higher for their uninsured patients than they are for their patients who have either private health insurance or are eligible for Medicare of Medicaid." Tr. 9:14–19. Plaintiffs' state law claims, like their federal claims, are largely premised on Plaintiffs' baseless assertions that hospitals designated as charitable institutions are required to provide free health care to the uninsured and indigent. The state claims clearly raise questions of federal health care policy, especially when viewed in the context of the dozens of nearly identical state law claims in the dozens of similar lawsuits filed in courts all over the United States. For the reasons set forth below, Plaintiffs' state law claims are dismissed with prejudice.

### 1. Tax Exemption Claims

 Plaintiffs claim to be third party beneficiaries of the contracts that were purportedly created between the NYP Defendants and the New York State and City Governments by virtue of the New York Not–For Profit Corporation Law § 402 and New York Real Property Law § 420(a), *et seq,* the state and local versions of § 501(c)(3). A not-for-profit hospital in New York is not required to provide free or reduced cost care as a condition of its tax exemption. *People ex rel. Doctors Hosp. v. Sexton,* 267 A.D. 736, 48 N.Y.S.2d 201 (1st Dep't 1944), *aff'd o.b.,* 295 N.Y. 593, 64 N.E.2d 289

(1945). For that reason and the many reasons Plaintiffs' claims arising out of § 501(c)(3) were dismissed, Plaintiffs' breach of contract claims arising out of the NYP Defendants' state and local tax-exemptions are dismissed.

Similarly, the Amended Complaint alleges that by accepting state and local tax exemptions, "the NYP Defendants created and entered into a public charitable trust to provide mutually affordable medical care to its uninsured patients." Am. Compl. ¶ 117. As is the case with Plaintiffs' charitable trust claim arising out of the NYP Defendants' federal tax exemption, Plaintiffs have failed to allege the basic elements of a trust with respect to their claim that a charitable trust has been formed by virtue of the NYP Defendants' state and local tax exemptions. Accordingly, this count is dismissed.

### 2. Breach of Contract

Plaintiffs contend that the NYP Defendants breached the contracts Plaintiffs were required to sign prior to their hospital admission, in which the NYP Defendants promised to charge Plaintiffs a fair and reasonable fee for the services provided. *See* Am. Compl. ¶¶ 95–97. At oral argument, it became crystal clear that Plaintiffs' only basis for alleging that the rates charged by the NYP Defendants were inflated is a comparison with the rates charged to health insurance companies and Medicare. Tr. at 26:10–26:23. It is undisputed that under New York law a hospital's charges to an uninsured patient are not unreasonable merely because a lower price is charged to government programs or other insurers. *See Huntington Hosp. v. Abrandt*, 4 Misc.3d 1, 779 N.Y.S.2d 891 (2d Dep't 2004); *Albany Med. Ctr. Hosp. v. Huberty*, 76 A.D.2d 949, 428 N.Y.S.2d 746 (3d Dep't 1980).

When asked at oral argument for an example of a rate charged to Plaintiffs by the NYP Defendants that is *objectively* inflated, Plaintiffs' counsel suggested that the NYP Defendants would be charging an objectively inflated rate were they to charge $1 million for a single aspirin. Tr. 20:20–20:24. Counsel's ability to conceive of an objectively inflated rate does not amount to an allegation of such a rate in this case. In fact, counsel never argued that the rates charged to the named plaintiffs were objectively unreasonable, much less alleged it. Instead, and despite my many attempts to extract a single, independent basis for this claim, Plaintiffs' counsel repeatedly insisted that a comparison of the rates charged to Plaintiffs with the rates charged to insured and Medicare- or Medicaid-eligible patients demonstrated the price inflation. Tr. at 26:10–26:17; 39:21–40:5; 65:17–22. Relying on such a comparison, however, would directly contravene established New York law. Because the Amended Complaint alleges no other facts which, if proven, would render the Hospital's charges unreasonable and because it was apparent at oral argument that counsel is unable to plead any additional facts, Plaintiffs' breach of contract claim is dismissed.

### 3. Breach of Duty of Good Faith and Fair Dealing

Plaintiffs' claim for breach of the duty of good faith and fair dealing that is implied in all contracts in New York stems from the alleged contracts formed between the NYP Defendants and the State and City of New York by virtue of the NYP Defendants' tax exemptions as charitable organizations. *See* Am. Compl. ¶¶ 109–114. This count necessarily depends on Plaintiffs' ability to demonstrate the existence of a contract between the NYP Defendants and the aforementioned governmental entities. Because Plaintiffs cannot do so, as discussed more fully above, this claim is dismissed.

### 4. Violation of the New York General Business Law § 349

■ Plaintiffs assert that the NYP Defendants and John Does 1–10 violated New York General Business Law § 349 by charging Plaintiffs unreasonably high rates for medical care despite their representations to the contrary and by aggressively pursuing the collection of these bills. *See* Am. Compl. ¶¶ 132–134. Section 349 of the New York General Business Law makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." GBL § 349(a). A prima facie case under this statute requires "a showing that defendant is engaging in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof." *See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995). A non-deceptive act or practice does not violate the statute. *Varela v. Investors Ins. Holding Corp.*, 81 N.Y.2d 958, 961, 598 N.Y.S.2d 761, 615 N.E.2d 218 (1993).

■ The fact that the NYP Defendants charged uninsured patients higher rates than other patients does not render the Hospital's statements deceptive. The Hospital had no obligation to disclose to Plaintiffs the rates other patients would be charged. *See Gershon v. Hertz Corp.*, 215 A.D.2d 202, 626 N.Y.S.2d 80 (1st Dep't 1995) (holding defendant not liable under GBL § 349 for failing to inform plaintiff of ways he could have secured a lower rate for a rental car); *Ho v. Visa U.S.A., Inc.*, 787 N.Y.S.2d 677, 2004 WL 1118534, *4 (2004) (finding no liability under GBL § 349 for allegedly excessive debit card fees). There is, therefore, no basis in the law for Plaintiffs' GBL claim.

In addition, the Plaintiffs have not alleged any injury as a result of Defendants' alleged violation of § 349. In the absence of well-pled allegations of some type of injury, not necessarily pecuniary, *see Bildstein v. MasterCard Int'l, Inc.*, 329 F.Supp.2d 410, 413 (S.D.N.Y.2004), caused by the alleged deceptive practice, Plaintiffs' GBL claim is dismissed. *See Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000); *Petitt v. Celebrity Cruises, Inc.*, 153 F.Supp.2d 240, 266 (S.D.N.Y.2001).

Furthermore, Kolari's claim is barred by the three-year limitations period applicable to § 349 claims. *See* CPLR 214(2); *Soskel v. Handler*, 189 Misc.2d 795, 736 N.Y.S.2d 853 (2001).

### 5. Unjust Enrichment/Constructive Trust

Plaintiffs claim that the NYP Defendants have been unjustly enriched at Plaintiffs' and the class members' expense by failing to utilize their assets and revenues to provide affordable medical care to Plaintiffs and class members. *See* Am. Compl. ¶ 137. Plaintiffs allege they are entitled to the imposition of a constructive trust in the amount of the NYP Defendants' federal, state, and local tax exempt savings and net assets. *See* Am. Compl. ¶¶ 138–139.

■ To state an unjust enrichment claim under New York law, Plaintiffs must allege: (1) that the NYP Defendants were enriched; (2) that the enrichment was at the Plaintiffs' expense; and (3) that the circumstances are such that in equity and good conscience the NYP Defendants should return the money or property to Plaintiffs. *See Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 79 (2d Cir.1986); *Nakamura v. Fujii*, 253 A.D.2d 387, 677 N.Y.S.2d 113, 116 (1st Dep't 1998). The imposition of a constructive trust requires a transfer of property belonging to the plaintiffs. *Sharp v. Kosmalski*, 40

N.Y.2d 119, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976); *Valvo v. Spitale,* 305 A.D.2d 668, 761 N.Y.S.2d 236 (2d Dep't 2003).

■ Because Plaintiffs assert that they have not paid for any of the services they received from the NYP Defendants, Plaintiffs have not conferred a benefit upon the NYP Defendants. Thus, passing considerations of equity and good conscience, Plaintiffs have not even stated the objective elements of a claim for unjust enrichment.

### 6. Fraud

■ Plaintiffs' fraud claim is rooted in the agreement Defendants allegedly required Plaintiffs to sign as a condition of receiving medical treatment. *See* Am. Compl. ¶¶ 171–173.[12] It was in this agreement, Plaintiffs argue, that the Hospital falsely represented that it would charge fair, reasonable, just, and customary rates. Am. Compl. ¶ 174. "Plaintiffs were never told that they would be charged multiple times more than other patients for the same services." Am. Compl. ¶ 174. The Amended Complaint further alleges that the NYP Defendants knew they falsely represented themselves as charitable organizations with the intent that they continue to receive tax-exempt status and other valuable government subsidies. Am. Compl. ¶¶ 176, 177. Plaintiffs claim that they relied on such misrepresentations and suffered economic and other damages (none of which are specified in the Amended Complaint). Am. Compl. ¶¶ 179–180.

Plaintiffs have failed to plead *any* of the elements of fraud with the particularity required by Fed.R.Civ.P. 9(b). Plaintiffs have entirely omitted from their Amended Complaint the "who, what, where and why." *See Harsco Corp. v. Segui,* 91 F.3d 337, 347 (2d Cir.1996). Plaintiffs have not pled that the NYP Defendants had the intent to commit fraud. Indeed, in response to inquiry at oral argument about the intent element, Plaintiffs' counsel retreated to the mantra that insured patients are charged less than uninsured patients. Tr. 48:12–49:25. It is clear from this exchange that Plaintiffs are unable to plead fraudulent intent. Plaintiffs have also failed to plead reliance. Although they allege that the hospital bombarded the public with propaganda and misinformation about its charitable practices, *see* Am. Compl. ¶ 179, they do not allege that Plaintiffs saw, heard, or read any of the alleged misrepresentations. Accordingly, Plaintiffs could not have relied on any such misrepresentations. For these reasons, Plaintiffs fail to state a cognizable fraud claim upon which relief can be granted.

### 7. Constructive Fraud

Plaintiffs contend that the NYP Defendants have engaged in overpricing, which inherently deceived Plaintiffs and other uninsured patients who are entitled to assume that they are not being charged at rates higher than those paid by patients covered by insurance. Am. Compl. ¶¶ 191–192.

■ A claim for constructive fraud must set forth the four elements of fraud and it must plead that the defendant had a duty to speak instead of keeping silent. *See Banque Arabe Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995). In addition to failing to plead intent to defraud, Plaintiffs do not plead facts which, if proven, would establish a duty to speak.

---

**12.** At oral argument, Plaintiffs' counsel revealed to the Court that Mr. Kolari was treated for his burns by Cornell Weill Medical Center prior to executing the above-referenced agreement; Mr. Kolari executed this agreement prior to his $75 aftercare sessions. Tr. 55:8–55:16.

■ A defendant has a duty to speak if it is in a confidential or fiduciary relationship with the plaintiff. *Republic of Croatia v. Trustee of Marquess of Northampton 1987 Settlement*, 203 A.D.2d 167, 610 N.Y.S.2d 263 (1st Dep't 1994). Such a relationship must have arisen before the transaction complained of, and it cannot be formed merely by a plaintiff's subjective decision to repose trust in the defendant. *See SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352, 355–56, 777 N.Y.S.2d 62, 65 (1st Dep't 2004). The Amended Complaint suggests that Plaintiffs commenced their relationships with the NYP Defendants by receiving the medical care for which they were charged. As a matter of law, this cannot create a fiduciary relationship.

■ Plaintiffs have also not pled facts sufficient to establish the duty to speak by virtue of the special facts doctrine. Under this test, a party in an arms-length transaction has a duty to disclose information to the other if (1) it has superior knowledge, (2) that is not available to the other party by reasonable inquiry, (3) it knows the other party is acting on the basis of mistaken belief, and (4) the transaction is unfair. *See Banque Arabe*, 57 F.3d at 157. Plaintiffs have not alleged that they could not have learned of the NYP Defendants' charging practices through reasonable inquiry. Moreover, they have not contended that the NYP Defendants knew Plaintiffs were acting on the basis of a mistaken belief. Nor have they alleged that the transaction was unfair. *See supra* p. 573–74. For all of these reasons, the constructive fraud count is insufficient.

### 8. Civil Conspiracy/Concert of Action and Aiding and Abetting Claims Against the AHA

■ The actions that form the basis of Plaintiffs' allegations against the AHA are threefold: (1) the AHA provided information and guidance to its members by way of "White Papers"; (2) the AHA petitioned the government on behalf of its members to clarify or change regulations; and (3) the AHA reported publicly the amount of uncompensated care the AHA member hospitals bear each year. Plaintiffs assert that these actions amounted to the AHA's conspiring with, aiding, and abetting the NYP Defendants' wrongful actions as laid out in the preceding counts of the Amended Complaint. As I have discussed above, Plaintiffs have failed to satisfy the liberal Rule 12(b)(6) standard in any of their federal or state claims. Accordingly, the AHA cannot be found to have aided or abetted any of the NYP Defendants' allegedly wrongful actions. The claims against the AHA must, therefore, be dismissed with prejudice.

Plaintiffs' many arguments all rest upon the premise that a charitable hospital is compelled by law to provide free services to all who cannot, or claim they cannot, afford to pay for those services. However, no federal or state statute and no principal of common law requires a private not-for-profit hospital to charge uninsured patients the same, or less, than the rates it charges to members of health insurance plans or the rates such a hospital accepts from Medicare and Medicaid.

### CONCLUSION

For the foregoing reasons, the Defendants' motions to dismiss the above-captioned actions are granted in their entirety with prejudice. The Clerk of the Court shall mark these actions closed and all pending motions denied as moot.

SO ORDERED